UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALTON THOMAS,

          Plaintiff,

          v.                    1:21-CV-1358 (DNH/PJE)

TOWN OF LLOYD, TOWN OF LLOYD
POLICE DEPARTMENT, TOWN OF
PLATTEKILL, TOWN OF PLATTEKILL
POLICE DEPARTMENT, NEW YORK
STATE POLICE, NY STATE TROOPER
THERESA DILUVIO, PAUL POE #1,
PAUL POE #2, PAUL POES, COURTNEY
J. NIELSON, MICHAEL HENRY, and
ARKEEM GORHAM,

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| JEFFREY A. ROTHMAN,<br>   ATTORNEY AT LAW<br>Attorney for Plaintiff<br>305 Broadway, Suite 100<br>New York, NY 10007 | JEFFREY A. ROTHMAN, ESQ. |
| MURPHY BURNS GROUDINE LLP<br>Attorneys for Town Defendants<br>407 Albany Shaker Road<br>Loudonville, NY 12211 | STEPHEN M. GROUDINE, ESQ.<br>THOMAS K. MURPHY, ESQ. |
| HON. LETITIA JAMES<br>New York State Attorney General<br>Attorneys for State Defendants<br>The Capitol<br>Albany, NY 12224 | DAVID C. WHITE, ESQ.<br>BRIAN W. MATULA, ESQ.<br>Assistant Attorneys General |

DAVID N. HURD
United States District Judge

## **DECISION and ORDER**

### I.    **INTRODUCTION**

On December 20, 2021, plaintiff Alton Thomas[1] ("Thomas" or "plaintiff") filed this civil rights action alleging claims under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and related state law resulting from a wellness check conducted by state and local law enforcement officers at his home on August 27, 2020.[2]

On June 20, 2025, defendants the New York State Police ("NYSP"), NYSP Trooper Diluvio, and NYSP Sergeant Nielson (collectively the "State defendants" moved for summary judgment.  Dkt. No. 100.  That same day, the Town of Plattekill, the Town of Lloyd, Town of Plattekill Officer Arkeem Gorham, and Town of Lloyd Officer Michael Henry (collectively the "Town defendants") moved for summary judgment.  Dkt. No. 101.  Thereafter, plaintiff opposed and cross-moved for summary judgment, too.  Dkt. No. 105.

---

[1] On March 19, 2025, U.S. Magistrate Judge Paul J. Evangelista permitted Joseph Acampora to act as Guardian Ad Litem to plaintiff in this litigation.  Dkt. No. 94.

[2] Plaintiff has amended his complaint twice: on March 3, 2022, and again on March 31, 2023.  Dkt. Nos. 11, 43.  The second amended complaint is the operative pleading.  Dkt. No. 43.

The three motions have been fully briefed and will be considered on the basis of the submissions without oral argument.

## II.   **<u>BACKGROUND</u>**[3]

Plaintiff lives in Ulster County, New York.  Around midmorning on August 27, 2020, plaintiff drank a can of beer and, in his words, "took more of [his] medication than [he] was supposed to."  Pl.'s Depo., Dkt. No. 100-13 at 26 ("Q: How much more of your medication and which medication?  A: Seroquel and Flexeril, probably about seven or eight pills.").

Plaintiff called his sister, Deborah Burgess, who lived in Delaware.  *See* Pl.'s Depo. at 21–22; Burgess Depo., Dkt. No. 105-19 at 40.  The phone call was brief.  By his account, plaintiff told his sister "a joke that wasn't funny to her," then hung up.  Pl.'s Depo. at 20, 29; *id.* at 20 ("Q: Can you tell me exactly what it was that you talked to your sister about[?]"  A: I told her a way to death with a cocktail [sic].");  Pl.'s Depo. at 21 ("Q: [I]s that something you said during the course of a longer conversation[?]  A:  That's all I did, called her and made that statement.").

Plaintiff insists that this comment was meant only in jest, and he was not suicidal at all.  Pl.'s Depo. at 23 ("Q: Why did you call her that morning . .

---

[3]  The parties' approach to the factual narrative—and plaintiff's approach in particular—has posed serious analytical challenges.  Using the voluminous record and the filings, and working to the best of its ability, the Court has recounted the relevant events and noted where the material facts are genuinely disputed.  The analytical challenges are discussed in more detail *infra* in IV.A.

. to make that statement?  A: I have no clue.  Just to—just to get my sister riled up.");  Pl.'s Depo. at 30 ("Q: [D]id you intend to kill yourself that morning?  A: No.  Q: Why would you say that then[?]  A: Put it this way: I didn't plan on it seriously, you know.  My mouth was going, because I had the pills in me.").

Even so, out of concern for his well-being, plaintiff's sister, Deborah Burgess, called the New York State Police ("NYSP") at about 12:21 p.m.  *See* Burgess Call to NYSP Dispatch, Dkt. No. 105-20 at 3 ("I received a call about a half hour ago from my brother, who said he took some pills.  I just spoke to him two minutes ago, and I don't know.  He doesn't sound right.  [C]an you send a trooper over to check on him?").

State Police Dispatch enlisted NYSP Trooper Diluvio to conduct a wellness check on plaintiff.  Diluvio Depo., Dkt. No. 101-7 at 18.  According to Trooper Diluvio, NYSP dispatch asked her "to check on a subject in regards to a mental illness call, a suicidal subject who had ingested some pills."  Diluvio Depo., Dkt. No. 101-7 at 18; *see also id.* ("Q: Do you remember anything else of the substance of that call[?]  A: It was called in by his sister who lived in another state.  Q: Anything else?  A: That's all I recall.").

Meanwhile, plaintiff or his neighbor, Rodney McCarthy, reached out to plaintiff's ex-girlfriend, Kelly O'Toole.  *See* Pl.'s Depo. at 36 ("A: [M]y neighbor called my ex and let her know, so she was here too."); O'Toole Depo., Dkt. No.

105-15 at 15–16 ("A: I got a message from [plaintiff] saying I think I did it this time.  I felt like I knew what that meant and I rushed over to his house.").

Ms. O'Toole arrived at plaintiff's home before law enforcement.  *See* Pl.'s Depo. at 38 ("A: So your [ex-]girlfriend was there before the state troopers?  A: Yeah[.]"); Pl.'s Depo. at 38–39 ("Q: Why did she come over if she was your ex-girlfriend?  A: She was concerned.  Q: What did she have to be concerned about?  A: She was concerned about me.  Q: Do you know why she was concerned about you?  A: I can't tell you that, sir.").

Plaintiff believes that law enforcement arrived at his home about an hour after he first spoke with his sister.  *See* Pl.' Depo. at 30; Pl.'s Depo. at 31 ("Q: How were you feeling during that hour?  A: Um, dazed."); Pl.'s Depo. at 30 ("Q: What time did [the police] arrive?  A: I have no clue.  It had to be around 10 o'clock.  Q: Why do you say around ten?  A: Because that's when they got here."); *but see* Burgess Call to NYSP Dispatch, Dkt. No. 105-20 at 1 ("Recorded on 27-Aug-2020 at 12.21.31"); Pl.'s SOMF, Dkt. No. 105-33 at 3 ¶ 98 ("Ms. Burgess' call with the NY State Police . . . per the file name [] appears to have started recording at 12:21 pm and 31 seconds[.]").

Trooper Diluvio was the first law enforcement official to arrive on the scene.  Pl.'s Depo. at 31, 37.  Noticing Trooper Diluvio's arrival, plaintiff says he walked out of his home onto his porch.  Pl.'s Depo. at 34 ("Q: And why did you come outside?  Did she knock on the door or did you just come out?  A:  No,

5

I heard them pulling in. Actually, I heard the alarm down the road, I heard it, the sirens down the road.").

However, Ms. O'Toole believes Trooper Diluvio knocked on the door of plaintiff's home before he came out. *See* O'Toole Depo., Dkt. No. 105-15 at 16 ("A: I got to his house, I went in, we were talking. A knock comes to the door. It's a State Trooper, female, and she said I'm here to do a well check. Tony came to the door. I don't remember what she asked him or whatever but he came out onto the porch.").

Trooper Diluvio introduced herself to plaintiff and Ms. O'Toole, plaintiff's ex-girlfriend. *See* Diluvio Depo. at 20–21 ("A: I introduced myself and I asked, you know what's going on. Q: What was their response, either of their response to that? A: [I]n sum and substance, I remember that Mr. Thomas was a little agitated and I remember Kelly [O'Toole] motioning to me, [t]hat was kind of a motion that she put her hand up to her mouth like he had ingested something. [T]he dispatch information was that he had ingested pills, so I took her . . . gesture [to] mean[] that he had ingested something.").

Trooper Diluvio asked plaintiff to come down off his porch and walk towards her. Pl.'s Depo. at 33; *see also* Pl.'s Depo. at 34 ("Q: So you're outside the trailer? A: Yes."); Pl.'s Depo. at 41 ("A: I got three steps on my porch. I was on the top step[.]"); Pl.'s Depo. at 34 ("Q: When you were out on the porch

6

having this exchange with the trooper, where was she? A: Standing like by her car. Q: How far away from you would you estimate? A: Fifteen, 20 feet.");

Plaintiff declined Trooper Diluvio's request. Pl.'s Depo. at 41–42 ("A: I asked her, what, did I do anything wrong[?] [S]he says, just come over here, please, just come over here. Q: And then what happened? A: I walked inside and shut my door."); O'Toole Depo., Dkt. No. 105-15 at 16 ("A: He didn't want to answer any more questions. There was nothing else to answer, [he] went back in the house. He did not want her in the house and at that point I was off the porch standing near her."); *see also* O'Toole Depo., Dkt. No. 105-15 at 21–22 ("Q: So you were in the house . . . at the time that the trooper first arrived? A: Correct. Q: And then when was it that you left the trailer? A: When Tony stepped out onto the porch I stepped out there with him and I never went back in the trailer. Q: So initially you were both standing on the porch; is that correct? A: Correct. Q: And where was the trooper when you were talking? A: There's about four steps to the ground and she was at the ground, and I think she had asked me to step off the porch and I stepped down and he didn't want to and that's when he went back inside[.]"); *see also* O'Toole Depo., Dkt. No. 105-15 at 25 ("Q: [D]id anything change with regard to [] Tony's demeanor and appearance as [things] progressed? A: I wasn't with Tony, I was outside, so I wouldn't know from the time he didn't want to come out of the trailer[.] I could see inside the door but that's it. I saw a couple of police there[.]"); O'Toole

Depo. at 26 ("Q: And so when was the next time that you actually saw Tony? A: When they were bringing him out of the house in the handcuffs."); O'Toole Depo., Dkt. No. 105-15 at 26 ("Q: [W]hen you were outside . . . did you ever see Tony coming out onto the porch at all or opening up the door and coming out at all?  A: No, not until they brought him out.").

Trooper Diluvio testified that once plaintiff went inside, Ms. O'Toole, plaintiff's ex-girlfriend, informed her that plaintiff "had taken pills."  Diluvio Depo., Dkt. No. 101-7 at 29–30 ("Q: The first time he went into his home, did he shut the door behind him?  A: Yes.  Q: What happened then?  A: I believe at that point is when I did speak with Ms. O'Toole as far as, you know, what she had seen, some idea as to why I was there, and what he was upset about.  Q: And what did Ms. O'Toole tell you at that point?  A: She had said that he had taken pills.  Q: Did she specify what he had taken?  A: I remember muscle relaxers, I don't remember if it was Seroquel or Suboxone[,] but I know the muscle relaxers she . . . reported[.]"); *but see* Diluvio Depo. at 21 ("Q: Did [O'Toole] ever tell you with words that he had ingested something?  A: Yes, when I interviewed her separately.  Q: After the tasing or before?  A: I don't remember if it was after or before.  One of the points that he went into his residence, I believe I spoke with her in that time period.").

However, Ms. O'Toole has no recollection of informing Trooper Diluvio of any such thing—at least not prior to plaintiff's tasing, which happened much

8

later.  *See* O'Toole Depo., Dkt. No. 105-15 at 28–29 ("Q: [D]id you speak directly to any of the law enforcement before Tony was tased?  A: No, no.  The only one I spoke to was that initial trooper . . . [t]he female[.]  Q: [D]id you tell her what Mr. Thomas had told you about taking medication?  A: No.  Actually, she told me what the sister said.  I don't remember now, yeah.  I don't think so."); *but see* O'Toole Depo. at 64 ("Q: [D]o you recall telling law enforcement officers that when you arrived he was taking a handful of Suboxone and muscle relaxers? A: Suboxone, no.  Q: What was it that you told them?  A: Actually, I think she asked me why were you upset when I got to the door[,] which I was, and I told her I swiped some pills out of his hand.  I may have said that."); *see also* O'Toole Depo., Dkt. No. 105-15 at 35 ("[Trooper Diluvio] seemed to get upset that he wouldn't come out of the trailer or let her in the trailer.  Then when I asked her [to] let me go in the trailer and talk to him she said no, because he could hurt me.  I told her Tony's not going to hurt anybody.  She [] said he could have a knife.  I said Tony's not going to hurt me, Tony's not going to hurt anybody, and she said I know he won't, I'll just tase him.").

At this point, the parties' accounts diverge further.  Trooper Diluvio asserts that plaintiff was irate and erratic, going in and out of his trailer and onto the porch several more times.  *See* Diluvio Depo. at 31 ("Q: How long was Mr. Thomas in his home that first time from the time he went in and shut the door until the time he emerged?  A: It was brief.  I would say about two

minutes[.]" Q: [W]hat happened then when he emerged from the trailer after having been in there about two minutes? A: I tried to engage him in conversation again[,] to which he would not answer my questions and at that point he had raised his voice. I don't remember exactly what he was yelling about or his specific words, but I do remember him yelling and not answering the questions that I was asking."); Diluvio Depo. at 35 ("Q: What happened next? A: He went back in his house. Q: Did he shut the door behind him? A: Yes. Q: [H]ow long was he in his trailer the second time before you saw him again? A: Just a few minutes again. Q: Did any other member of law enforcement show up on the scene before you saw Mr. Thomas again? A: No."); Diluvio Depo. at 38 ("Q: [W]hat happened after this next conversation, after he emerged from the house, the second time? A: He went back in the house again. Q: And did he shut the door? A: Yes. Q: [W]hen he went into his house the third time, how long was he in there before you saw him again? A: A few minutes again.").

By the time Trooper Diluvio claims that plaintiff had entered and exited his trailer in agitated fashion for a third time, backup had arrived. Diluvio Depo. at 35 ("Q: Now, while he was in his house this second time that he went in, did anybody else show up at the scene while he was inside? A: No. I called for backup at that point. Q: How long was he in his trailer the second time before you saw him again? A: Just a few minutes again. Q: Did any other member of law enforcement show up on the scene before you saw Mr. Thomas

10

again?  A: No."); Diluvio Depo. at 39 ("A: At some point in there [S]ergeant [Nielson] did show up on the scene.  [I] do know that Lloyd and Plattekill both arrived.  I just don't recall specifically when.").

After Trooper Diluvio, Town of Plattekill Officer Gorham was the next member of law enforcement to arrive.  Gorham Depo. at 32 ("Q: When you arrived[,] what members of law enforcement were [there] at that time?  A: The New York State Police.  Q: How many members of the New York State Police were there[?]  A: To my memory, I believe only one member.  [A] female.").

First, Officer Gorham spoke to Trooper Diluvio.  *See* Gorham Depo. at 35 ("A:  I approached the female trooper and asked her what the situation was. [S]he said there was a suicidal male inside the trailer who refused to come out.").  Then Officer Gorham also spoke to plaintiff's ex-girlfriend, Ms. O'Toole. Gorham Depo. at 35 ("A: [I] walked over to the girlfriend and made contact with her.").  Officer Gorham alleges that Ms. O'Toole informed him of her belief that plaintiff was actively suicidal.  *See* Gorham Depo. at 38 ("Q: Did she tell you what he had done to make her think he was suicidal?  A: He made verbal statements and he attempted to take a handful of pills?  Q: Did she tell you she had seen that?  A: Yes.").

Then Officer Gorham spoke with Ms. O'Toole for several minutes. Gorham Depo. at 43 ("Q: How long did you speak with [her] for at that time? A: I would say almost—I don't recall how long.  Q: Can you approximate?  A: I

11

would say approximately five to seven minutes perhaps."). As the two spoke, Officer Gorham says Trooper Diluvio attempted to talk to plaintiff. Gorham Depo. at 43 ("A: I believe she was trying to speak with Mr. Thomas through the door."). However, Officer Gorham could not hear the substance of any exchange between Trooper Diluvio and plaintiff. *See* Gorham Depo. at 43–44.

Around that point, Officer Gorham says, NYSP Sergeant Nielsen and Town of Lloyd Officer Henry also arrived on the scene. Gorham Depo. at 44 ("Q: During that five to seven minutes[,] did any other members of law enforcement come to the scene? A: Yes. Q: Who? A: A Town of Lloyd Police Officer[] and at least one other New York State Police Officer or Trooper."). Officer Gorham observed that, upon their respective arrivals, Sergeant Nielsen and Officer Henry approached and spoke with Trooper Diluvio as well. *See* Gorham Depo. at 45–46.

Officer Henry arrived before NYSP Sergeant Nielsen. *See* Henry Depo., Dkt. No. 105-12 at 22 ("A: As I was pulling up, the Town of Plattekill Police arrived and the New York State Trooper, who was requesting assistance, was on scene."); *see also id.* At 21 ("Q: What first notified you that there was something happening at Mr. Thomas's home that caused you to go there on the date of the incident? A: I was in the dispatch area of the Town of Lloyd Police Department. I heard over the Ulster County 911 channel that a New York State Police unit was requesting assistance with a suicidal subject barricaded.").

12

According to Officer Henry, upon his arrival Trooper Diluvio explained to him that "[s]he had been called [be]cause of a report of a male who had taken medications, and the reporting party believed that the subject was attempting to commit suicide." Henry Decl., Dkt. No. 100-16 ¶ 10; *see also* Henry Depo., Dkt. No. 105-12 at 25 ("Q: She tell you whom the reporting person was? A: No.").

Trooper Diluvio told Officer Henry that she had attempted to speak with plaintiff prior to Officer Henry's arrival, but plaintiff "was hostile and irate with her[.]" Henry Decl. ¶ 11; *id.* ¶ 12 ("According to Trooper Diluvio, the individual had locked himself inside the trailer/residence during her interaction with him."); *id.* ¶ 13 ("Trooper Diluvio's main concern was that the individual may have gone unconscious due to the medications that he was reported to have ingested.").

Trooper Diluvio informed Officer Henry that she was waiting for her Sergeant to arrive and "in the meantime, we should continue to try to contact [plaintiff]." Henry Decl. ¶ 14; Henry Depo. at 27 ("[W]e were waiting for her supervisor to arrive."). "In response to the information [Officer Henry] learned from Trooper Diluvio, [he] stood outside the residence and looked towards the windows to see if there was movement inside." Henry Decl. ¶ 15.

Shortly after that, NYSP Sergeant Nielson arrived.[4]  While Trooper Diluvio and Sergeant Nielson spoke, Officer Henry says he gave them space, and "maintained a perimeter of the residence."  Henry Decl. ¶ 17; Henry Depo. at 29 ("A: I wasn't part of the conference with the two.").  As he did this, Officer Henry observed Officer Gorham "speaking with a female who was involved somehow."  Henry Decl. ¶ 18.

Trooper Diluvio says she apprised Sergeant Nielson, her superior officer, of the situation.  *See* Diluvio Depo., Dkt. No. 101-7 at 41 ("A: I advised him that I had . . . tr[ied] to engage with Mr. Thomas numerous times in conversation and him not answering questions, him not complying with coming down of the porch to speak with me, and his continuous behavior of going into his house.").

According to Trooper Diluvio, plaintiff then came out onto the porch for a fourth time.  *See* Diluvio Depo. at 43 ("Q: Did Mr. Thomas come out of his home himself after that third time of going in or did you and Sergeant Nielson go in?  A: He came back out again."); Diluvio Depo. at 44 ("Q: Did he go back into his home again a fourth time?  A: He did.").

At this point, Trooper Diluvio asserts that she and Sergeant Nielson decided to approach plaintiff's home.  *See* Diluvio Depo. at 52.  Once they made it onto the porch, Trooper Diluvio says plaintiff opened his front door, and she

---

[4] Nielson has since been promoted to lieutenant.  *See* Nielson Depo., Dkt. No. 101-6 at 8 ("A: When were you promoted to lieutenant, sir?  A: November 11, 2021.").  Unless otherwise specified, the two titles are used here interchangeably in reference to Nielson.

14

and Sergeant Nielson went inside. *See* Diluvio Depo., Dkt. No. 101-7 at 57 ("Q: Do you remember how the door opened? Was it Mr. Thomas who opened the door or either you or Sergeant Nielson who opened the door? A: He opened the door."); *but see* Diluvio Depo. at 56 ("A: I don't recall if he opened it on his own or we knocked on the door. [I] recall the door being opened, but I don't remember if he opened it on his own or we knocked at that point. [W]e had already been up on the porch at that point."); *see also* Nielson Decl. ¶ 19 ("After the efforts to have Plaintiff come down from his porch failed and Plaintiff again began to go back into his residence, Trooper Diluvio and I followed him into his trailer.").

The State defendants' version of their approach to plaintiff's home appears to be an abbreviated version of what led them inside. For instance, Officer Henry says that, prior to law enforcement's entry into plaintiff's home, Joseph Acampora, plaintiff's best friend and landlord, "asked to make contact with [plaintiff] in the trailer, and the Troopers allowed him to do so."[5] Henry Decl. ¶ 19. "The landlord went up to the doorway, and [plaintiff] inside opened the door to allow the landlord to enter the residence." *Id.* ¶ 20. Plaintiff then

---

[5] The State defendants dispute this. *See* Diluvio Depo. at 52 ("Do you remember Joe [Acampora] ever saying to you, you know, he's a friend of mine . . . let me go in and see if I can talk with him and smooth things over and get him to speak with you[?] A: I do remember vaguely a conversation with Joe, but I would . . .never let him go into the house at that point. I don't remember the full conversation[,] but I—I do remember I would not let him in the house."); *see also* Nielson Depo. at 57 ("A: I recall him expressing an interest in going in to Mr. Thomas's trailer. Q: [A]nd what did you say in response to Mr. Acampora's express— A: Yeah, that we're not gonna have somebody else go into the trailer.").

closed the door with the landlord inside. *Id.* ¶ 20; Henry Depo. at 32 ("Q: How long was the landlord in the trailer with Mr. Thomas? A: I don't recall exactly. Maybe a couple of minutes at most.").

According to Acampora, when he went inside "[t]here was no one in the house, just Tony and [his] dog." J. Acampora Depo. at 19. Acampora asked plaintiff what was going on. "[He] said something to [his sister] jokingly about maybe hurting himself, something like that, and he said that then the police were there. He said please just tell them to leave, I'm okay, everything's all right, and that's what he said." J. Acampora Depo. at 20.

Officer Henry alleges that, "[w]hen the landlord [i.e., Acampora] exited the trailer, he left the front door open and walked off the porch." Henry Decl. ¶ 21. That is when, according to Officer Henry, "[t]he Troopers walked up the porch and went into the residence" and Officer Henry followed the two inside. Henry Decl. ¶¶ 21, 22; *see* Henry Depo. at 33 ("Q: Was the door still open from when the landlord left and that's how they could walk into the residence? A: Yes."); Henry Depo. at 33 ("Q: Did you ever ask permission to enter Mr. Thomas's apartment? A: No. Q: Did you ever hear Mr. Thomas give anybody any permission to enter his apartment? No."); Henry Depo. at 34 ("Q: When the troopers walked in[,] did they walk in there in front of you? A: That's correct.").

16

Plaintiff, for his own part, offers the most truncated telling of defendants' entry into his home, one that lacks any alleged back-and-forth on his part between trailer interior, porch, or landlord.  Instead, he contends that "after [he] shut the door on her" (i.e., Trooper Diluvio), three law enforcement officers entered his home without his consent.  Pl.'s Depo. at 42–43.

In any event, the parties seem to agree that Trooper Diluvio and Sergeant Nielson entered the home first.  *See* Diluvio Depo. at 58 ("A: We attempted to have a conversation with him again about coming out of the house and that we wanted to get him help and talk to him further about what was going on and see if we could get him to go to the hospital to be evaluated[.]").

Trooper Diluvio recalls at all times being intent on getting plaintiff to the hospital.  Diluvio Depo. at 59 ("Q: Was it your position that he had to go to the hospital at that point?  A: Yes.  Q: When you [first] arrived at the scene, was it your position that he had to go to the hospital?  A: Yes.  Q: If he did not voluntarily go to the hospital, were you going to force him[?]  A: Yes.").

Once inside, according to plaintiff, an unspecified number of officers started going through his "pills and [] private possessions."  Pl.'s Depo. at 45; *cf.* Diluvio Depo., Dkt. No. 101-7 at 67–68 ("A: I picked up a pill bottle that was right by the doorway.  [I] believe there was some sort of table area or counter right as you walked in[.]  Q: About how many feet into the apartment were you at that point?  A: Not many.  The doorway's a very small doorway.  A few feet.

17

I would say . . . maybe 4 or 5 feet."); Nielson Decl. ¶ 22 ("Trooper Diluvio saw a pill bottle . . . and picked it up[.]"); Henry Decl. ¶ 24 ("I did not pick up any property while in the residence."). Plaintiff protested. *See* Diluvio Depo. at 68 ("Q: [M]r. Thomas told you to put the pills down? A: Yes.").

The parties' stories continue to diverge. Trooper Diluvio says she followed plaintiff's instruction at once and without issue. Diluvio Depo. at 68 ("Q: And you did put the pills down? A: I did."); Diluvio Depo. at 75 ("Q: Did Mr. Thomas ever take his pill bottle from you? A: No. Q: Did Mr. Thomas ever take any item from your possession? A: No. Q: Did Mr. Thomas ever touch you before the shove? No.").

Nevertheless, Trooper Diluvio says, "a confrontation . . . ensued in the doorway." Diluvio Depo. at 66. According to Sergeant Nielson and Officer Henry, "plaintiff appeared willing to voluntarily leave his house," and "turned to the front door to exit the residence[.]" Nielson Decl. ¶¶ 23, 24; *see* Henry Decl. ¶ 25.

However, they say that plaintiff then changed his mind. Henry Decl. ¶ 26 ("[P]laintiff wanted to return to the inside of the residence, but Trooper Diluvio said he could not go in. During this conversation, Trooper Diluvio was inside the front doorway to the residence. [She and plaintiff] were a foot or two apart, facing each other."); Nielson Decl. ¶ 25 ("As we were attempting to exit[,] Plaintiff became more hostile and aggressive.").

18

Trooper Diluvio unholstered her taser. *See* Diluvio Depo. at 76 ("A: Things were elevating in the doorway as far as the back and forth of yelling, him continuing to fail to obey commands given, to go back outside of the residence. So as a safety measure, yes, I took out my Taser[.]").

Shortly after, Trooper Diluvio says that plaintiff shoved her in the chest or shoulder. Diluvio Depo. at 66 ("Q: Did he shove you with both of his hands? A: I don't recall if it was with one or both."); Diluvio Depo. at 69–70 ("Q: When he shoved you, was it more akin to a push on the chest or was it that he struck you in the chest? A: He pushed me. Q: Okay. But it was a push and not a blow; is that correct? A: He didn't use a closed fist, no."); Diluvio Depo. at 71 ("Q: Do you remember any physical contact being made between any member of law enforcement and Mr. Thomas prior to you tasing him other than Mr. Thomas shoving you? A: No."); *see also* Henry Decl. ¶¶ 27, 28 ("From my vantage point[,] about 6-10 feet away[,] I observed the plaintiff lift his hands . . . in what appeared to me to be a motion to push Trooper Diluvio. At that moment, Trooper Diluvio . . . tased the plaintiff[.]"); Henry Depo. at 39 ("Q: Did he actually take his hands and push them into her body? A: I don't recall if he made physical contact with her."); Henry Depo. at 42 ("Q: Did you see at any point Trooper Diluvio get knocked back? A: I recall her going backwards. I'm not sure if she was pushed backwards or if she took a step backwards.");

19

Nielson Decl. ¶ 26 ("I heard the pop of Trooper Diluvio's taser being deployed[;] I did not see the taser deployed because my view was obstructed[.]").

However, plaintiff recalls it differently.  He recalls "snatch[ing]" the pill bottle out Trooper Diluvio's hand, which directly precipitated her tasing him. Pl.'s Depo. at 46–47 ("A: She wasn't putting it down and I think I snatched it from her hand and that's when I got shot with a taser.").

The parties agree that once he was tased, plaintiff went down.  Pl.'s Depo. at 48 ("Q: So you snatched the bottle?  A: I went right down, yep.  Q: The next thing that happens is what?  A: Bang, bang. [I] went down to the ground."); Pl.'s Depo. at 49 ("Q: Who tased you; do you know?  A: The little cop, the woman officer.  Q: The female trooper?  A: Yes."); Diluvio Depo. at 80 ("He feel to the ground as a result of the taser; correct?  A: Yes."); Henry Decl. ¶ 29 ("[P]laintiff went down immediately, falling forward into the residence on an open space in the floor in front of the doorway.").

During these events, Officer Gorham was still outside speaking to Ms. O'Toole, plaintiff's ex-girlfriend.  *See* Gorham Depo. at 48.  But upon hearing "the pop of a Taser[,]" Officer Gorham "ran over to the trailer."  Gorham Depo. at 49; *see also* Henry Depo. at 44 ("Q: After he fell on the ground, what happened?  A: [I] believe the Plattekill officer came inside at that moment.").

Once plaintiff was on the ground, Trooper Diluvio—with the help of the other law enforcement officers at the scene—handcuffed plaintiff.  *See* Gorham

20

Depo. at 57 ("Q: Were both of the troopers involved with making contact with Mr. Thomas's arms in order to have him be handcuffed?  A: Yes.  Q: And you were holding Mr. Thomas's legs down?  A: Yes."); Nielson Decl. ¶ ("I assisted Trooper Diluvio in placing mechanical restraints on Plaintiff."); *see also* Diluvio Depo. at 80 ("Q: Who put the handcuffs on his wrist?  A: I did.  Q: [A]nd when you put the handcuffs on his wrists, you rear-handcuffed him behind his back; correct?  A: Yes."); Diluvio Depo. at 80 ("We attempted to get him handcuffed at that point, Sergeant Nielson and I — and at that point the two officers from the local PDs were in the doorway at that point.  During the conversation they were in the doorway behind Mr. Thomas and at that point we attempted to get him handcuffed and then up."); Diluvio Depo. at 81 ("Q: [W]hen you rear-hand-cuffed him[,] where were the other three law enforcement officers[?]  A: They were all down on the ground with me.  Q: And were they holding Mr. Thomas down in some manner?  A: Yes.  Q: Was Mr. Thomas struggling in any way?  A: Yes and yelling."); Diluvio Depo. at 82–83 ("Q: Did you require any . . . assistance from the other law enforcement officers on scene to place his hands together behind his back and . . . handcuff[] him?  A: Yes.  Q: [W]hich officer helped you to put his arms together such that you could handcuff him[?]  A: They all did as far as I recall."); Diluvio Depo. at 83 ("Q: Were any of them on his legs?  A: I believe so yes, [t]o keep him from kicking."); *but see* Henry Decl. ¶¶ 30, 32, 33 ("The Troopers placed the plaintiff in handcuffs, and Trooper

21

Diluvio applied the handcuffs.  [I] did not touch the plaintiff during the hand-cuffing process.  [I] assisted another officer with gently getting him up off the ground and into a chair.").

After being cuffed, plaintiff was escorted to an ambulance waiting out-side.  Pl.'s Depo. at 52; Pl.'s Depo. at 51 ("A: They had put the cuffs on really, really tight and even the EMS, they were asking them to uncuff me[.]"); *see* O'Toole Depo., Dkt. No. 105-15 at 17 ("A: [T]hey were walking Tony out in handcuffs behind his back, and then there was an ambulance there and Tony was screaming, they're too tight, they're too tight[.]"); O'Toole Depo., Dkt. No. 105-15 at 26 ("A: He was saying that the cuffs hurt, please loosen them[.]"); *see also* Pl.'s Depo. at 53 ("Q: [A]t some point did someone take your handcuffs off? A: Yes.  Q: Who did that?  A: The person that they belonged to.  Q: Was that a trooper?  A: Yes.").

Plaintiff was taken in the ambulance to the hospital for evaluation.  *See* Pl's Depo. at 58.  Plaintiff was never informed by law enforcement that he was under arrest.  *See* Pl.'s Depo. at 58 ("Q: Did the troopers tell you, you were under arrest at any time?  A: No.").

## III.   <u>LEGAL STANDARD</u>

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is

material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted). Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## IV.   DISCUSSION

### A.   Preliminary Matters

Before reaching the merits of plaintiff's claims, there are a number of preliminary matters to address.

### 1.   Motion Practice Deficiencies

As noted *supra*, the parties' filings have created some impediments to the legal analysis—in particular, plaintiff's failure to comply with this District's local rules and the Court's prior Orders in this case.

Under Local Rule 7.1, a movant's memorandum in support of a motion for summary judgment (or a non-movant's opposition to such a motion), may

23

not exceed twenty-five pages in length. L.R. 7.1(b)(1) ("No party shall file or serve a memorandum of law that exceeds twenty-five (25) pages in length, double-spaced, unless that party obtains leave of the judge hearing the motion prior to filing."). A movant's reply may not exceed ten pages. L.R. 7.1(a)(1).

An opposition to a dispositive motion (*e.g.*, a motion for summary judgment) must be filed within twenty-one days of service. L.R. 7.1(a)(1) ("Unless otherwise ordered by the Court, the opposing party must file and serve its opposition papers no more than TWENTY-ONE (21) DAYS after service of the motion."). A movant's reply must be filed within seven days after service of the non-movant's opposition. L.R. 7.1(a)(1).

On June 4, 2025, the parties sought the Court's permission to modify these default briefing limitations. *See* Dkt. No. 97 at 1. There, the parties jointly asked that defendants be allowed to file 35-page briefs supporting their respective motions for summary judgment. *Id.* Plaintiff would then oppose those motions and file a cross-motion in a single 70-page brief.[6] *Id.* The parties also proposed extended deadlines: 49 days for plaintiff's opposition, 28 days for defendants' replies, and 21 days for plaintiff's reply. *See id.*

The following day, June 5, 2025, the Court issued a text order <u>denying</u> the parties' request. *See* Dkt. No. 99 (denying request "based substantially on

---

[6] Were the Court to grant their request, defendants' reply papers would remain limited to 10 pages, and any additional opposition to plaintiff's cross-motion would be capped at 20 pages. *See* Dkt. No. 97 at 1.

24

prior extensions of time in this matter and this Court's schedule and pending caseload").

On June 20, 2025, defendants timely filed their motions and briefs in accordance with Local Rule 7.1. *See* Dkt. Nos. 100, 101. Three days later, on June 23, 2025, plaintiff renewed his request for an extension of time to file his responses. *See* Dkt. No. 102. This time around he sought only 45 days, rather than the previously rejected 49 days. *Id.* at 1.

More importantly, plaintiff again requested permission to file a single oversized cumulative brief instead of separate briefs in response to the Town Defendants and to the State defendants. *See* Dkt. No. 102 at 2 ("It would be cumbersome and inefficient (both for the parties and for the Court), and would require burdensome and wasteful repetition and cross-referencing, for Plaintiff to have to file two separate memoranda[.]").

On July 3, 2025, the Court granted plaintiff's requested extension of time to file. *See* Dkt. No. 104. However, the Court denied plaintiff's second request to file a single 50-page memorandum in response to defendants' motions. *Id.* The Court clearly and unequivocally instructed: "Plaintiff shall file separate memoranda[,] of no more than 25 pages, in response to each motion." Dkt. No. 104. Thereafter, plaintiff filed his two opposition briefs within the time allotted by the approved extension. *See* Dkt. Nos. 105-36, 105-37.

But that appears to be the only instruction that plaintiff followed. Although plaintiff divided his filing into two "25-page" memoranda, he has, in essence, submitted a single 50-page memorandum. A fleeting glance at the two memoranda confirms that they function, in effect, as a single brief. *See, e.g.*, Pl.'s Resp. to NYSP Defs., Dkt. No. 105-36 at 4 ("The instant brief should be read before Plaintiff's brief in response to the Town Defendants' brief, as that brief incorporates the facts and law presented in the instant brief, which is, as stated, also submitted in response to the Town Defendants' motion as to Plaintiff's federal claims."); Pl.'s Resp. to Town Defs., Dkt. No. 105-37 at 12 ("For the same reasons stated in Point I (A) of Plaintiff's brief in response to the State Defendants' brief (at pages 15-18), which addressed Plaintiff's federal home invasion claims under the Fourth Amendment, Plaintiff should also be granted summary judgment on his cross-motion trespass claims under New York law[.]"); Pl.'s Resp. to Town Defs., Dkt. No. 105-37 at 5 ("Plaintiff also respectfully refers the Court to the Statement of Facts in Plaintiff's Memorandum of Law in opposition to the State Defendants' motion, which summarizes some of the numerous facts that bear on the instant matter. That summary—at pages 3-11 of Plaintiff's brief in opposition to the State Defendants' motion—will not, to avoid redundancy, be repeated here.").

"[U]nder this District's Local Rules of Practice, a party may not articulate a legal argument simply by "incorporating by reference" the argument

26

presented in another document." *Nissan Motor Acceptance Corp. v. Dealmaker Nissan, LLC*, 2012 WL 2522651, at *2 n.2 (N.D.N.Y. June 27, 2012) (citing *Topliff v. Wal–Mart Stores East LP,* 2007 WL 911891, at *9 n.65 (N.D.N.Y. Mar. 22, 2007)).

There are several reasons for this prohibition:  "Setting aside the risk that such reference could cause the referring document to violate the District's rule on page limitations (once it is incorporated into the referred document), such a practice also risks causing the opposing party to inadvertently overlook the attempted incorporation, and risks confusing the Court as to which "incorporated" arguments are actually being relied upon." *Nissan Motor Acceptance Corp.*, 2012 WL 2522651, at *2 n. 2.

In short, plaintiff requested—twice—leave to file a single cumulative brief.  The Court denied that request—twice.  Even so, plaintiff has filed a brief that contravenes the Court's instructions by attempting to "incorporate by reference" certain matters between the two briefs.

This conclusion brings the Court to the next major defect in plaintiff's filings.  Whereas Local Rule 7.1 governs motion practice more broadly, Local Rule 56.1 governs summary judgment procedure in particular.  Under Local Rule 56.1, "[a]ny motion for summary judgment shall contain a separate Statement of Material Facts" ("SOMF").  L.R. 56.1(a).

"The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." L.R. 56.1(a). "Each fact listed shall set forth a specific citation to the record where the fact is established." *Id.* Correspondingly, a non-movant "shall file a separate Response to the Statement of Material Facts." L.R. 56.1(b).

A non-movant's response to a movant's statement of material facts must "mirror the movant's Statement of Material Facts by admitting and/or denying each of the assertions in a short and concise statement, in matching numbered paragraphs." L.R. 56.1(b). "Each denial shall set forth a specific citation to the record where the factual issue arises." *Id.*

Plaintiff's responses to defendants' respective SOMFs (Dkt. Nos. 105-34, 105-35) violates Rule 56.1 because he inappropriately mixes arguments and conclusions of law together with statements of fact. *See, e.g., Butler v. New Paltz Cent. Sch. Dist.*, 2026 WL 849925, at \*4 (N.D.N.Y. Mar. 27, 2026).

For instance, the Town defendants asserted in their statement of material facts: "At no point in Trooper Diluvio's 20-year career did she ever face allegations of excessive force." Dkt. No. 100-19 ¶ 15. In response to that simple, one-sentence statement, plaintiff answered "Admit, but . . ." followed by

over two pages of unresponsive factual assertions, wholly irrelevant arguments, and indictments of Trooper Diluvio's character.[7]

This response is not a one-off occurrence. *See, e.g.*, Dkt. No. 105-35 at 15 ¶ 19 ("Deny, but . . . [a] jury could also disbelieve anything that Trooper Diluivo has said under the principle of *falsus in uno, falsus in omnibus*"); *id.* at 17 ¶ 21 ("Admit that Plaintiff described Trooper Diluvio as having once used the word "please," but object that it is irrelevant, as all of the non-party witnesses at the scene . . . testified in detail that Trooper Diluvio showed immediate and unremitting aggression and hostility . . . and that she was doing the very opposite of trying to de-escalate the situation."); *id.* at 19–20 ¶ 28 ("Admit, but note that a jury can infer that this reference to a suicidal subject was based upon . . .); Dkt. No. 105-34 at 7 ("Admit that Trooper Diluvio has testified that Kelly O'Toole told her that Ms. O'Toole had seen Plaintiff take pills, but deny—as it is not on the cited page—that Ms. O'Toole stated to Trooper Diluvio that

---

[7] *See* Dkt. No. 105-35 at 10 ¶ 15 ("Admit, but . . . [w]hat is at issue in the case . . . are the actions and omissions of [Trooper Diluvio] on August 27, 2020. For example, all of the non-party witnesses at the scene observed Trooper Diluvio's behavior in the run up [to] the illegal home entry and use of force and false arrest therein . . . Further, Trooper Diluvio's testimony that she Tased Plaintiff in immediate response to Plaintiff shoving her in the chest[] is a bald lie. [P]laintiff went to grab his dog to move the dog away out of worry for the safety of his dog, and was immediately Tasered by Trooper Diluvio upon trying to get his dog . . . [S]till further damning, Trooper Diluvio also completed official police paperwork . . . that falsely stated that Plaintiff had not only pushed her, but that Plaintiff also pushed Sgt. Nielson . . . [A]ll of the other law enforcement officers other than Trooper Diluvio . . . seemed shocked that Plaintiff was Tased . . . [T]he other individual Defendants unreasonably failed to intervene to prevent Trooper Diluvio's multiple problematic and unconstitutional actions toward Plaintiff, despite it being so obvious to everyone present that she was acting in an aggressive and unprofessional manner, and they followed her and assisted her in her problematic and unconstitutional behaviors against Plaintiff (i.e., unlawfully entering Plaintiff's home, and handcuffing Plaintiff with excessive tightness in his home after Trooper Diluvio unlawfully Tased him, and in taking Plaintiff to the hospital in the excessively tight handcuffs against his will).").

29

Plaintiff had taken an "unknown" number of pills[,] [and] [o]bject[] that the presentation of this "fact" is tendentious and misleading.").

In those instances where plaintiff's responses to defendants' assertions are not multi-page arguments, he still fails to provide the required concise admission or denial. Instead, he simply directs the Court to *other* paragraphs of his response—typically, those paragraphs that include the improper, multi-page arguments. *See, e.g.*, Dkt. No. 105-35 at 13 ¶ 16 ("See, response to #15, supra."); *id.* at 19 ¶¶ 24, 25 ("See, responses to #s 15 and 18, supra.").

In fact, many of plaintiff's responses to defendants' SOMFs consist of nested cross-references: plaintiff responds to one paragraph of defendants' respective statements by directing the Court to his response to another paragraph, which in turn directs the Court to yet another paragraph, and so on and so forth. *See, e.g.*, Dkt. No. 105-35 at ¶ 42 ("See, response to #41, supra."); *Id.* at ¶ 41 ("Deny. See, responses to #s 30 and 36, supra."); *id.* at ¶ 36 ("Deny. See, response to # 30, supra.").

The cascade of redirection does not stop there. Rather than citing to the areas of the record where the dispute arises, as Local Rule 56 requires, plaintiff directs the Court to review broad swaths of his own "additional facts." *See, e.g.*, Pl.'s Resp. to Town Defs.' SOMF, Dkt. No. 105-35 at 21 ¶ 30 (directing the Court to Plaintiff's Additional Facts ¶¶ 363–385, 400, 405–417, 454–477 in

response to the simple assertion that "Officer Gorham saw one female Trooper and a female civilian when he arrived on the scene").

Moreover, it is impossible to reconcile plaintiff's decision to label this document full of "additional facts" as "Plaintiff's Statement of Additional Material Facts *in Dispute*" with his express disclaimer that these "additional facts" are neither disputed nor necessarily even material. *See* Dkt. No. 105-34 at 18 n.4 ("Plaintiff also includes herein facts that are undisputed but that inure to Plaintiff's favor on the Defendants' motions, or that are otherwise useful for understanding the events of August 27, 2020.").

Finally, there is nothing "short and concise" about plaintiff's responses to defendants' SOMF or his "Additional Facts." With respect to the State defendants, the two sections combined span nearly 150 pages. *See* 105-34. With respect to the Town defendants, the two sections clock in at 175 pages. *See* 105-35. This litigation involves civil rights claims over a discrete event that unfolded over several hours on a single day. There is no reason for the briefing to rival Tolstoy's War and Peace in terms of length and complexity.

"[T]he purpose of . . . the Statement of Additional Material Facts in Dispute, is not to provide a non-movant a convenient spot to slip in additional argument, present wholly superfluous facts, or recharacterize undisputed facts in a favorable gloss." *Butler v. New Paltz Cent. Sch. Dist.*, 2026 WL 849925, at *4 (N.D.N.Y. Mar. 27, 2026). The Local Rule 56.1 procedure "is not a

31

suggestion, nor is it a rule of general guidance upon which attorneys are free to impose their own interpretations of what must be submitted[.]" *Id.* (quoting *Riley v. Town of Bethlehem*, 5 F. Supp. 2d 92, 93 (N.D.N.Y. 1998)).

"It is not even intended for the parties' benefit: 'Following this and other aspects of [the] Local Rule . . . saves the reviewing court the trouble of having to do what this Court is doing right now—double- and triple-checking each individual factual allegation to try to determine whether it is genuinely in dispute or whether the non-movant just wants it to appear to be in dispute[.]'" *Id.* (quoting *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 725 (N.D.N.Y. 2020)).

Plaintiff contends that "[t]he factual record in this case is convoluted." Pl.'s Resp., Dkt. No. 105-36 at 4. Whatever truth there may be to that statement, it is needlessly exacerbated by plaintiff's own convoluted responses and efforts to inundate the Court with minutiae and discovery details, irrespective of their materiality.[8] *See Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988) (observing that needlessly prolix filings place "an unjustified burden on the

---

[8] *See, e.g.*, Pl.'s SOMF, Dkt. No. 105-33 n.1 ("Plaintiff is also filing, as part of Plaintiff's responses to the Defendants' respective Local Rule 56.1 statements of material fact, a Statement of Additional Material Facts in Dispute ("Pl. Addt'l Facts"), that presents, in addition to these statements by the individual Defendants (which conflict with each other in many ways), the narratives of the non-party witnesses and Plaintiff himself (which narratives also conflict with the individual Defendants' narratives). The individual Defendants' narratives on various points also conflict internally with themselves. On Defendants' motions for summary judgment - where the facts and inferences from the facts must be taken in the light most favorable to Plaintiff - the Defendants' narratives are, of course, very much in dispute. The numbering of these facts presented herein are not consecutive, as they track the numbering in Pl. Addt'l Facts, for ease of reference.").

32

court and the party who must respond to [them] because they are forced to select the relevant material from a mass of verbiage").

Plaintiff compounds the difficulties posed by his filings by either making fundamentally inconsistent statements of fact—asserting something to be true in one filing, then denying it elsewhere in his papers—or by altogether refusing to take a position on material factual issues. *Compare* Dkt. No. 105-34 at 8 ¶ 13 (responding, unequivocally, "Deny." to the assertion he "entered and exited his residence multiple times while in the presence of Trooper Diluvio and Lt. Nielson." ) *with* Pl.'s Additional Facts, Dkt. No. 105-34 at 94 ¶ 593 ("Even though he had not done anything like this *during the four times that he went inside and then back outside of his home* onto his porch, Trooper Diluvio claims that she was concerned that Plaintiff might possibly go into his home [and] get a hypothetical weapon[.]").

This approach does little to benefit plaintiff. It only makes the task of determining whether genuine issues of material fact exist for trial needlessly onerous.[9] "Summary judgment is not an opportunity to challenge this Court to a game of rhetorical Whack-a-Mole." *Hess v. State Farm Mut. Auto. Ins. Co.*,

---

[9] None of this is to say that defendants have followed the rules flawlessly. For instance, the Town defendants also appear to misunderstand the purpose of a Rule 56.1 statement, treating it as an opportunity to free up space for additional argument in their briefs. *See, e.g.*, Dkt. No. 100-20 at 3 ("Relevant Procedural History and Facts: For the sake of brevity, the Court is respectfully referred to the accompanying Attorney Affidavit of Stephen M. Groudine, Esq., Affidavits of Michael Henry and Arkeem Gorham, and Defendants' Statement of Material Facts Pursuant to Local Rule 56.l(a) for a full recitation of procedural history and facts."). This is improper. The Court will interrogate these failings more extensively in the Discussion section, *infra*.

33

2024 WL 1012911, at *1 (D. Colo. Mar. 8, 2024).  Plaintiff's counsel is directed to review this District's local rules and practice standards because this kind of inexplicable noncompliance will carry consequences going forward, including but not limited to future non-compliant filings being stricken from the docket.

## 2.    Unidentified Defendants

Plaintiff's second amended complaint appears to assert claims against unidentified Town of Lloyd police officers ("John Does"), unidentified Town of Plattekill police officers ("Michael Moes"), and unidentified NYSP Troopers ("Paul Poes").  *See* Dkt. No. 43.

On summary judgment, none of the remaining parties mentions the Does, the Moes, or the Poes.  Instead, plaintiff's filings identify the "State Defendants" as "retired NY State Trooper Theresa Diluvio, NY State [Sergeant] Courtney Nielson, and the New York State Police" and the "Town Defendants" as "Police Officer Henry, Police Officer Gorham, the Town of Lloyd, and the Town of Plattekill."

Discovery is closed.  The Does, Moes, and Poes have not been identified by plaintiff.  Accordingly, defendants Michael Moe #1, Michael Moe #2, the unenumerated Michael Moes, Paul Poe #1, Paul Poe #2, the unenumerated Paul Poes, and any remaining John Does are dismissed without prejudice.  *See, e.g.*, *Harris v. Tioga County*, 663 F. Supp. 3d 212, 233 (N.D.N.Y. 2023) (collecting cases).

34

C.     **What Federal Claims Remain?**

Plaintiff's remaining claims arise under § 1983, the Americans with Disabilities Act, the Rehabilitation Act, and related state law.  But the exact scope of plaintiff's federal claims require some untangling.  In Count One of his operative complaint, plaintiff asserts a claim under Section 1983, references the "First, Fourth, and Fourteenth Amendments," and includes a litany of broad allegations:

> By their conduct and actions in searching and seizing plaintiff, falsely arresting and imprisoning plaintiff, assaulting and battering plaintiff, trespassing upon plaintiff's home and person, violating and retaliating for plaintiff's exercise of his rights to free speech, violating plaintiff's rights to due process, violating plaintiff's rights to equal protection of law, acting to cover up the misconduct of the other defendants, failing to intercede on behalf of the plaintiff and in failing to protect the plaintiff from the unjustified and unconstitutional treatment he received at the hands of other defendants, each of the individual Defendants, acting under color of law and without lawful justification, intentionally, maliciously, and with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of plaintiff's constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, including its First, Fourth and Fourteenth amendments.

Pl.'s Second Am. Compl., Dkt. No. 43 ¶ 117.

In its prior Order resolving the Town defendants' motion to dismiss, the Court construed Count One to assert § 1983 claims against the individual defendants (i.e., NYSP Trooper Diluvio, NYSP Sergeant Nielson, Officer Gorham, and Officer Henry) for: (1) false arrest and imprisonment; (2) excessive force;

(3) unreasonable search; (4) free speech retaliation; (5) denial of due process; and (6) a violation of equal protection. *See Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 132 (N.D.N.Y. 2024).

Although the State defendants had not concurrently moved for dismissal at that time, the Court remarked in its Order that, "plaintiff may wish to discontinue his First Amendment Retaliation, Due Process, and Equal Protection claims against the State Defendants for the same reasons that he fails to plausibly allege these claims against the Municipal Defendants." *Thomas*, 711 F. Supp. 3d at 142 n.12.

In response to defendants' motions for summary judgment and in support of his own cross-motion, plaintiff only discusses federal claims that he has brought under the Fourth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("Rehab Act"). *See* Pl.'s Resp. to NYSP Defs., Dkt. No. 105-36 at 14–26; *see also, e.g.*, Pl.'s Resp. to NYSP Defs. at 2 (including in memorandum's Table of Contents only "Fourth Amendment claims" and "ADA and Rehabilitation Act claims").

"Where a partial response to a motion [for summary judgment] is made— *i.e.,* referencing some claims or defenses but not others . . . in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip.*

36

*Ltd.*, 716 F. App'x 5, 14 (2d Cir. 2017) (summary order) (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 197–98 (2d Cir. 2014)).

Upon review, plaintiff has abandoned his First Amendment Retaliation claim and his Fourteenth Amendment Due Process and Equal Protection claims against all of the defendants. To the extent that these claims were not abandoned, the Court has considered them and finds them to be without merit. Accordingly, those claims will be dismissed.

### D.    The Merits

Plaintiff's remaining federal claims are brought against the individual State and Town defendants (i.e., NYSP Trooper Diluvio, NYSP Sergeant Nielson, Officer Gorham, and Officer Henry) under the: (a) Fourth Amendment; (b) ADA; and (c) Rehab Act. Plaintiff's state-law claims are only brought against the Town defendants for: (a) trespass; (b) false arrest and imprisonment; (c) assault and battery; and (d) vicarious liability. *See* Second Am. Compl. at 26 n.2 (Count V: False Arrest and False Imprisonment); *id.* at 27 n.3 (Count Six: Assault & Battery), *id.* at 28 n.4 (Count Seven: Trespass).

### 1.    Federal Claims

Plaintiff's remaining federal claims are brought against the individual State and Town defendants (i.e., NYSP Trooper Diluvio, NYSP Sergeant Nielson, Officer Gorham, and Officer Henry) under the: (a) Fourth Amendment; (b) ADA; and (c) Rehab Act.

37

### a.    Fourth Amendment

Plaintiff asserts § 1983 individual-capacity Fourth Amendment claims against NYSP Trooper Diluvio, NYSP Sergeant Nielson, Officer Gorham, and Officer Henry for: (i) unlawful entry; (ii) excessive force; and (iii) false arrest and imprisonment.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. "A 'search' in the context of the Fourth Amendment occurs when the police intrude upon a person's reasonable expectation of privacy or if the police otherwise trespass upon one's person, house, papers, or effects for the purpose of acquiring information." *Conroy v. Caron*, 275 F. Supp. 3d 328, 340 (D. Conn. 2017) (citing *Florida v. Jardines*, 569 U.S. 1, 133 (2013)). "A 'seizure' under the Fourth Amendment occurs when the police intentionally terminate one's freedom of movement by means of physical force or by show of their official law enforcement authority." *Id.* (citing *Brendlin v. California*, 551 U.S. 249, 254 (2007)).

### i.    Unlawful Entry[10]

"At the 'very core' of [the Fourth Amendment's] guarantee . . . stands 'the right of a man to retreat into his own home and there be free from unreasonable government intrusion.'" *Case v. Montana*, 607 U.S. 107, 113 (2026) (quoting *Caniglia v. Strom*, 593 U.S. 194, 198 (2021)).[11]   Importantly, however, "the Fourth Amendment does not prohibit all unwelcome intrusions on private property—only unreasonable ones." *Caniglia*, 593 U.S. at 198 (citing *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (internal alterations omitted)).

"When the intrusion is into that most private place, 'reasonableness' usually means having a warrant." *Case*, 607 U.S. at 113 (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)); *United States v. Lee*, 660 F. App'x 8, 13 (2d Cir. 2016) (summary order) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (quoting *Brigham City*, 547 U.S. at 403).

"But not always: The warrant requirement is subject to certain exceptions." *Case*, 607 U.S. at 113–14 (2026) (quoting *Lange v. California*, 594 U.S.

---

[10]  Consistent with the Fourth Amendment, this was previously characterized by the Court as an "unreasonable search" claim. *Thomas*, 711 F. Supp. 3d at 143.  Plaintiff's summary judgment filings dub this a Fourth Amendment "home invasion" claim. *See* Pl.'s Resp. to NYSP Defs., Dkt. No. 105-36 at 17–19.  Irrespective of its labeling, as alleged and argued, plaintiff presents a Fourth Amendment claim for unlawful entry. *See* Pl.'s Resp. to NYSP Defs at 5 ("[T]he individual Defendants . . . unlawfully entered Plaintiff's home[.]"); *id.* at 19 ("Thomas has . . . alleged that the Officers entered plaintiff's home without a warrant or his consent.") (quoting *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 135 (N.D.N.Y. 2024)).  Accordingly, the Court considers the claim under that rubric.

[11]  The State and Town defendants filed letter motions requesting that the Court take "judicial notice" of this recent Supreme Court decision.  Dkt. Nos. 108, 109.  Those motions will be terminated.

39

295, 301 (2021)).  The emergency aid doctrine "is a subset of the exigent-circumstances exception to the warrant requirement." *Ringel v. Cnty. of Nassau*, 2021 WL 4316715, at \*5 n.34 (E.D.N.Y. Sept. 22, 2021).

"Under the emergency aid exception to the warrant requirement, 'law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Alicea v. City of Bridgeport*, 2025 WL 1982127, at \*2 (2d Cir. July 17, 2025) (summary order) (quoting *Michigan v. Fisher*, 558 U.S. 45, 47 (2009)).

When assessing whether this exception applies, the Court asks "whether an officer had 'an objectively reasonable basis for believing' that his [or her] entry was directly needed to prevent or deal with serious harm." *Case v. Montana*, 607 U.S. at 117 (quoting *Brigham City*, 547 U.S. at 400).  "It goes without saying that in determining the lawfulness of entry . . . we may concern ourselves only with what the officers had reason to believe at the time of their entry." *Ker v. State of Cal.*, 374 U.S. 23, 41 n.12 (1963) (citing *Johnson v. United States*, 333 U.S. 10, 17 (1948)); *see also United States v. Ramirez*, 523 U.S. 65, 71 (1998) (same).  "The objective reasonableness of an officer's conduct . . . is evaluated by looking at the 'totality of the circumstances.'" *Id.* at 118 (collecting cases).

### 1.    State Defendants

a.    *Trooper Diluvio*

Trooper Diluvio argues that her "entry into Plaintiff's residence was []
objectively reasonable given the circumstances—Plaintiff threatened suicide
and continued to re-enter his residence, where State Defendants could not ob-
serve him."  NYSP Defs.' Mot. Summ. J., Dkt. No. 101-10 at 7.

"The core question is whether the facts, *as they appeared at the moment
of entry*, would lead a reasonable, experienced officer to believe that there was
an urgent need to render aid or take action[.]"  *United States v. Klump*, 536
F.3d 113, 117–18 (2d Cir. 2008) (emphasis added) (internal citations and alter-
ations omitted).

According to Trooper Diluvio, the NYSP dispatcher requested that Dilu-
vio "respond to a mental health incident for a subject who was suicidal and had
ingested an unknown amount of an unknown medication."  Diluvio Decl., Dkt.
No. 101-3 ¶ 8.  In her affidavit, Trooper Diluvio also asserts that she was "told
that the initial call was made by Plaintiff's sister who advised that Plaintiff
called her and told her that he was suicidal and had ingested medication to
end his life."  Diluvio Decl., Dkt. No. 101-3 ¶ 9.

Trooper Diluvio, however, does not specify when this information was
allegedly conveyed to her.  Further absent from the available record is any
transcript, recording, or other account of that initial dispatch call to Trooper

41

Diluvio—notably, Trooper Diluvio alleges that this initial dispatch call is how she first learned of plaintiff's suicidality and which she now offers as the primary foundation underpinning her belief that plaintiff was suicidal. Rather, the sole piece of evidence available in the record of any call between NYSP dispatch and Trooper Diluvio is Trooper Diluvio's notification *to* dispatch that she would be at plaintiff's address "for a welfare check." Dkt. No. 105-21 at 3.

The particulars of the communications between dispatch and Trooper Diluvio are important. Recall that evidence in the record shows Ms. Burgess made the initial report to dispatch. If Ms. Burgess's message was conveyed *verbatim* to Trooper Diluvio, the only information Trooper Diluvio would be privy to at that time was that (i) Ms. Burgess had "received a call . . . from [her] brother" who (ii) told her that "he took some pills" and that (iii) Ms. Burgess said he did not "sound right." Dkt. No. 105-20 at 3.

Certainly, Ms. Burgess's decision to contact New York State Police demonstrates the fact of her concern for plaintiff's well-being. However, it says little about any specific reason why Ms. Burgess was concerned. Nothing in Ms. Burgess's call reveals what substance(s) plaintiff took, the amount he took, or, crucially, what plaintiff intended (or even what Ms. Burgess believed plaintiff intended) in ingesting the substance(s). *See* Burgess Call, Dkt. No. 105-20 at 3–4. She could have just as likely believed that plaintiff was suffering an

42

adverse, unintended reaction to some medication. In other words, Ms. Burgess's call conveyed only a set of partial, limited factual assertions.

That would appear to leave at least two obvious possibilities. The first: the NYSP dispatcher interpreted Ms. Burgess's call to be one regarding a suicidal person and conveyed this subjective understanding to Trooper Diluvio, who could have reasonably relied on it. The second: the NYSP dispatcher communicated Ms. Burgess's call to Trooper Diluvio *verbatim* and it was Trooper Diluvio who surmised that plaintiff was suicidal.

Of course, the source and basis of Trooper Diluvio's contemporaneous belief shape any interpretation of her later conduct. Either way, what was said to Trooper Diluvio in that initial NYSP dispatch call (i.e., her basis and degree of knowledge) is plainly disputed. *See* Pl.'s Resp. to NYSP Defs.' SOMF ¶ 6; Pl.'s Resp. to Town Defs.' SOMF ¶ 19. Therefore, the dispatch call alone cannot serve as a basis for summary judgment on the claims against Trooper Diluvio.

The question of whether the remaining basis offered for Trooper Diluvio's initial entry into plaintiff's home constitutes an objectively reasonable basis for warrantless entry cannot be resolved as a matter of law on this convoluted fact record, either. Trooper Diluvio claims that "[u]pon arrival, Kelly O'Toole confirmed that Plaintiff had ingested an unknown number of pills that morning." NYSP Defs.' Mot. Summ. J., Dkt. No. 101-10 at 4 (citing Diluvio Decl. ¶ 12).

43

However, as noted above, it is disputed that Ms. O'Toole told Trooper Diluvio any such thing.[12]  Indeed, Trooper Diluvio concedes that when she arrived on scene plaintiff was not exhibiting outward signs of physical distress that might tend to corroborate an exigency.  Diluvio Depo., Dkt. No. 105-16 at 29 ("Q: Now, when you had been speaking with Mr. Thomas before he went into his home the first time, was his voice slurred or was he speaking in a normal voice?  A: As far as I recall it was normal. [I] don't remember any slurring."); Diluvio Depo., Dkt. No. 105-16 at 29 ("Q:  And when Mr. Thomas walked into his home, was he staggering or was he walking with a normal gait?  A: He was walking with a normal gait.").

In short, based on the limited set of undisputed facts before the Court, and in light of the many *disputed* facts in the record, it cannot be said—as a matter of law—that exigent circumstances existed permitting Trooper Diluvio's entry into plaintiff's home.

---

[12] The State defendants' brief inserts the temporal qualifier "upon arrival" despite the fact that Diluvio's cited declaration does not state when Ms. O'Toole allegedly informed Trooper Diluvio of this information. *See* Diluvio Decl. ¶ 12 ("Plaintiff was agitated and unwilling to speak with me. I was advised by Kelly O'Toole that Plaintiff had taken an unknown quantity of pills that morning.").  Similarly, Trooper Diluvio's deposition testimony is equivocal on the order of events. *See* Diluvio Depo. at 21 ("Q: Did [O'Toole] ever tell you with words that he had ingested something?  A: Yes, when I interviewed her separately.  Q: After the tasing or before?  A: I don't remember if it was after or before. One of the points that he went into his residence, I believe I spoke with her in that time period.").

b.    *Sergeant Nielson*

Neither does it appear, as a matter of law, that Sergeant Nielson possessed an objectively reasonable basis for believing that his entry into plaintiff's home was necessary under the circumstances.  According to Sergeant Nielson's declaration, his own personal observations consisted only of "[plaintiff] going into and out of his home, and not complying with the direction to come off his porch and onto the ground."  Nielson Decl. ¶ 17.

But neither a person's lack of interest in obliging officers' requests about where to stand or speak nor that person's entry and exit into their own home is enough to establish exigent circumstances as a matter of law.  *See Myers v. Patterson*, 819 F.3d 625, 634 (2d Cir. 2016) ("A person may be annoyed, uncooperative, and irrational without presenting a danger to herself or of violence to others.").

Beyond this argument, Sergeant Nielson states only vaguely that "after arriving, Trooper Diluvio advised [him] of the situation."  Nielson Decl. ¶ 10; *but see* Nielson Depo. at 24 ("Q: And what did she tell you?  A: I don't recall specifics.").  But that is not enough.  Again, based on the limited undisputed facts before the Court, and in light of the many *disputed* facts in the record, it cannot be said—as a matter of law—that exigent circumstances existed permitting Sergeant Nielson's entry into plaintiff's home.

### 2.    Town Defendants

Plaintiff's failure to follow the mandates set forth in Local Rule 56.1 and the Court's prior direct instructions are perhaps most apparent when considering whether his § 1983 claims against Officers Gorham and Henry should get to a jury.

Plaintiff's response to the Town Defendants' summary judgment motion largely skirts any discussion of facts respecting either Officer Gorham or Officer Henry's conduct or observations on the date in question. *See* Pl.'s Resp. to Town Defs., Dkt. No. 105-37 at 4 (directing the Court to "Plaintiff's brief in response to the State Defendants' brief, as this brief respectfully incorporates the facts . . . presented in that brief").

Even looking at the other brief, plaintiff provides only a single fact regarding Officer Henry and Officer Gorham's conduct: "After Plaintiff went inside of his home, Trooper Diluvio and her supervisor, Sgt. Nielson, pushed their way into Plaintiff's home, followed immediately by Officers Henry and Gorham." Pl.'s Resp. to NYSP Defs., Dkt. No. 105-36 at 8. Looking to the parties' Local Rule statements in the hopes that plaintiff more clearly articulates, or at least is willing to concede, anything that the Town defendants did or did not do that day is similarly fruitless.

At bottom, plaintiff disputes nearly every factual assertion made about Officer Gorham and Officer Henry solely on the basis that he believes the two

46

to be liars. *See, e.g.*, Pl.'s Resp. to Town Defs.' SOMF, Dkt. No. 105-35 ¶ 30 ("A jury could find Officer Gorham to be not credible or unreliable as to which individuals were present at, or what was said at or what occurred at, the scene based upon his other erroneous reporting about who was at the scene, like his erroneous reporting that Plaintiff's sister, Deborah Burgess, was at the scene. [A] jury could also find Officer Gorham to be not credible or unreliable based upon his evasive answers about why he left his employment with the Town of Plattekill Police Department. [A] jury could also find Officer Gorham to be not credible or unreliable based upon the significant and material changes made to his narrative concerning the August 27, 2020 incident with Plaintiff, and his absurd testimony given in that regard concerning what facts he deemed to be important."); *id.* ¶ 59 ("A jury could find Officer Henry to be not credible or unreliable as to which individuals were present at, or what was said at or what occurred at, the scene based upon his other erroneous reporting about what occurred at the scene, which is dissimilar from the narrative of all other witnesses.").

This is not enough to create a genuine dispute of fact. "A [party] may not create a genuine issue of material fact by simply challenging the credibility of a declarant." *Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist.*, 327 F. Supp. 3d 477, 521 (N.D.N.Y. 2018). Accordingly, for the purposes of resolving the motions, the Court deems as admitted every properly supported

47

fact set forth in the Town Defendants' Statement of Material Facts that plaintiff has not specifically controverted.  *See* L.R. 56.1(b).

Upon review in light of those admitted facts, and based on a review of the rest of the available record, both Officer Henry and Officer Gorham had an objectively reasonable basis for entering plaintiff's home.  Recall that it is undisputed by plaintiff that these two defendants appeared on the scene later in response to a second, county-based emergency dispatch "that a New York State Police unit was requesting assistance with a suicidal subject barricaded." Henry Depo. at 21; *see* Town Defs.' SOMF, Dkt. No. 100-19 ¶ 28 ("Officer Gorham was on patrol when he heard a radio call from the county-based dispatch about State Police needing assistance with a suicidal subject."); Pl.'s Resp. to Town Defs.' SOMF, Dkt. No. 105-35 ¶ 28 ("Admit[.]"); Town Defs.' SOMF, Dkt. No. 100-19 ¶ 57 ("Officer Henry heard a call over Ulster County 911 dispatch about New York State Police requesting assistance with a suicidal subject who was barricaded."); Pl.'s Resp. to Defs.' SOMF, Dkt. No. 105-35 ¶ 57 ("See, response to #28, supra.").

Further, it is not reasonably disputed that, upon his arrival, Officer Henry was told by Trooper Diluvio that: (1) she was responding to "a male who had taken medications, and [whom] the reporting party believed . . . was attempting . . . suicide"; (2) plaintiff was "hostile and irate with [her]," and "had locked himself inside"; and (3) Trooper Diluvio's "main concern was that

48

[plaintiff] may have gone unconscious due to the medications[.]" Henry Decl. ¶¶ 10–13.

Nor is it reasonably disputed that: (1) Trooper Diluvio informed Officer Gorham upon his arrival of "a suicidal male inside the trailer who refused to come out" or that (2) Officer Gorham then immediately interviewed Ms. O'Toole, who likewise told Officer Gorham that plaintiff was suicidal. Gorham Decl. ¶¶ 8–10; *id.* ¶ 10 ("[O'Toole] specified that he had made verbal statements which reflected an intent to harm himself, and she saw him attempt to take a handful of pills. At this point, the report from the Trooper that the subject inside of the trailer was suicidal was confirmed. The situation was one where time was of the essence.").

In sum, based on these undisputed facts about what these two individual defendants believed or reasonably understood, it was objectively reasonable for Officers Henry and Gorham to believe that exigent circumstances made their entry into plaintiff's home lawful. Accordingly, plaintiff's Fourth Amendment unlawful entry claims against the Town defendants must be dismissed.

### ii.    Excessive Force

"Claims that law enforcement officers used excessive force 'in the course of an arrest, investigatory stop, or other "seizure" of a free citizen' are 'analyzed under the Fourth Amendment and its "reasonableness" standard.'" *Mercedes*

49

*v. City of New York*, 2023 WL 8594055, at *3 (2d Cir. Dec. 12, 2023) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

"In analyzing excessive force claims, courts ask 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'" *Mercedes*, 2023 WL 8594055, at *3 (quoting *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021)). "Specifically, the excessive force inquiry 'requires careful attention to the . . . severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Mercedes*, 2023 WL 8594055, at *3 (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

"'[I]n light of the fact-specific nature of . . . an excessive force claim,' 'granting summary judgment against a plaintiff on [such a claim] is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.'" *Mercedes*, 2023 WL 8594055, at *3 (quoting *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015)).

Trooper Diluvio contends that she is entitled to summary judgment because plaintiff "pushed [her] in the chest" and "[i]n response, [she] deployed her taser." NYSP Defs.' Mot. Summ. J., Dkt. No. 101-10 at 11 (citing Diluvio Decl. ¶¶ 40, 41). She contends that this and any subsequent use of force "was

50

only the amount necessary to end the situation[.]"  NYSP Defs.' Mot. Summ. J., Dkt. No. 101-10 at 11.

Plaintiff offers a contrary account of what happened following defendants' entry into his home and leading up to his tasing.  But it is somewhat difficult to follow.  At some points, plaintiff denies touching Trooper Diluvio; at others, he appears to suggest that some kind of contact occurred, but not exactly when or in the manner that Trooper Diluvio claims.

Further, plaintiff recalls that, after being tased, he was rear-cuffed and that the cuffs were painful; however, plaintiff does not remember who restrained him or how.  *See* Pl.'s Depo. at 52–53 ("Q: After you'd fallen to the floor in the trailer, what's the next thing that happened, that you recall?  A: Putting the handcuffs on me.  Q: Were you cuffed with your hands in back or in front of you?  A: In back, I think.  Q: Who handcuffed you?  A: I'm not sure[.]  Q: What happened after you were handcuffed?  A: They had put the cuffs on really, really tight and even the EMS, they were asking them to uncuff me, and I guess that was a few minutes, because they were — they had to be in here, they had to be inside here, and she came out and they wouldn't loosen up the cuffs for a while and then she said for us to treat me, they have to take those cuffs off.").  Additionally, the testimony in the record differs considerably on whether plaintiff required handcuffing, whether he resisted it, and which law enforcement officer did what to him during the handcuffing process.

51

Given these outstanding factual disputes, the Court cannot find that any particular defendant's use of force was reasonable as a matter of law.  "At the summary judgment stage, 'district courts may not weigh evidence or assess the credibility of witnesses.'"  *Tsvetkov v. United States*, 2022 WL 986163, at \*4 (E.D.N.Y. Mar. 31, 2022) (quoting *Jeffreys v. City of N.Y.*, 426 F.3d 549, 551 (2d Cir. 2005)).  "Where there are "conflicting versions of events" necessitating credibility determinations, these are questions for the trier of fact."  *Tsvetkov*, 2022 WL 986163, at \*4 (citing *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 174-75 (2d Cir. 2006)).  Accordingly, plaintiff's excessive force claims against Trooper Diluvio, Sergeant Nielson, Officer Gorham, and Officer Henry survive summary judgment.[13]

### iii.    False Arrest and Imprisonment

Under the Fourth Amendment, "[a] plaintiff claiming false arrest or false imprisonment . . . must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Hepburn v. City of New York*, 2025 WL 1640205, at \*5 (E.D.N.Y. June 10, 2025) (internal citations and alterations omitted).

---

[13]  A law enforcement officer who is a bystander to a constitutional violation can be held liable for a failure to intervene if they had a reasonable opportunity to intercede.  *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  Given the outstanding factual disputes about the who, what, where, and when of these events, viewed in the light most favorable to plaintiff a fact-finder could determine that one or more named defendants were liable for excessive force on this basis.

The State defendants assert that they are entitled to summary judgment on plaintiff's false arrest claims. *See* NYSP Defs.' Mot. Summ. J. at 9. But simply proclaiming, as the State defendants do, that "probable cause existed for the mental health arrest of Plaintiff" is not enough to establish their entitlement to judgment on these claims. *See* NYSP Defs. Mot. at 9.

That is a legal conclusion, not an argument. And it is a legal conclusion presented, seemingly, in the abstract: the State defendants perform verbal somersaults to avoid saying that plaintiff was arrested or confined, let alone that they were the ones who arrested or confined him.

That is only part of their grammatical acrobatics. The ubiquity of the passive voice in the State defendants' filings leaves the impression that Trooper Diluvio and Sergeant Nielson simply vanished after entering plaintiff's home and reappeared only when plaintiff reached the hospital. *See, e.g.*, NYSP Defs.' SOMF, Dkt. No. 101-1 ¶¶ 18–22, 24 (internal citations omitted) ("Plaintiff was placed in handcuffs after being tased. Plaintiff was brought to his feet and exited his residence after being tased. Plaintiff was brought to an ambulance after exiting his residence. Plaintiff was placed on a stretcher prior to being loaded into the ambulance. Plaintiff had his handcuffs removed prior to departing for the hospital. Plaintiff arrived at the hospital and was treated by medical staff."). The State defendants cannot invoke a defense (or, at least,

53

cannot do so successfully) while refusing to identify sufficient facts in the record that support its application.

The Town defendants' argument is only marginally more developed. Officers Gorham and Henry contend that they "neither confined nor intended to confine the plaintiff." Town Defs.' Mot. Summ. J., Dkt. No. 100-20 at 7. Notably, though, those contentions appear to be contradicted by their own testimony. *See, e.g.*, Gorham Depo. at 57 ("Q: Were both of the troopers involved with making contact with Mr. Thomas's arms in order to have him be handcuffed? A: Yes. Q: And you were holding Mr. Thomas's legs down? A: Yes."); Henry Depo. at 51–52 ("Q: He was on the ground, they cuffed him, you then stood him up. After you stood him up, you put him in a chair? A: Yes. Q: And he was rear cuffed in the chair? A: Yes. Q: [H]ow long was he seated in the chair in the apartment? A: I don't recall . . . maybe a few minutes.").

Further complicating matters, even these contentions appear to be disputed by at least one of their co-defendants. *See* Diluvio Depo. at 82–83 ("Q: Did you require any . . . assistance from the other law enforcement officers on scene to place his hands together behind his back and . . . handcuff[] him? A: Yes. Q: [W]hich officer helped you to put his arms together such that you could handcuff him[?] A: They all did as far as I recall.").

Aside from this, the Town defendants offer mere variations on the same unavailing theme as the State defendants. They too argue that, if Officers

54

Gorham and Henry did in fact confine plaintiff, any such confinement was privileged as a matter of law. *See* Town Defs.' Mot., Dkt. No. 100-20 at 7 ("[T]he seizure of the plaintiff was privileged, and the plaintiff's false arrest claim must fail as a matter of law."); *see also id.* at 7 ("In the instant case, the Town officers had ample probable cause to believe that the plaintiff was a serious threat to himself. [G]etting the plaintiff medical treatment . . . was an emergent concern. In fact, their intervention could have saved his life.").

These arguments are all rejected. Plaintiff was obviously seized within the meaning of the Fourth Amendment. "Given the clear dispute as to what Defendants knew and/or observed at the time of Plaintiff's detention, a jury should decide what transpired between the officers and Plaintiff—only then, after those facts are found, can the existence of probable cause (or arguable probable cause) to seize Plaintiff under MHL § 9.41 be determined." *Druss v. Muscatella*, 2022 WL 3701085, at *6 (S.D.N.Y. Aug. 26, 2022) (collecting cases). Accordingly, defendants' motions for summary judgment are denied with respect to plaintiff's § 1983 Fourth Amendment false arrest and imprisonment claims against Trooper Diluvio, Sergeant Nielson, Officer Gorham, and Officer Henry.[14]

---

[14] As before, in light of the disputes over the material historical facts, a reasonable fact-finder could find one or more defendants liable under a failure-to-intervene theory.

55

### b. & c.    ADA and Rehab Act

The Court construes these claims as being asserted against the NYSP, the Town of Plattekill, and the Town of Lloyd.

"[C]ourts have found two fact patterns during the course of an arrest that can commonly raise a legitimate possibility of discrimination in violation of Title II or the Rehabilitation Act." *Thomas v. Town of Lloyd*, 2022 WL 1747650, at \*10 (N.D.N.Y. May 31, 2022) (citing *Durr v. Slator*, 558 F. Supp. 3d 1, 27 (N.D.N.Y. 2021)).

"The first is when police wrongfully arrest a plaintiff because they misinterpret his disability to be criminal activity." *Thomas v. Town of Lloyd*, 2022 WL 1747650, at \*10  (citing *Durr*, 558 F. Supp. 3d at 27–28).  "The second is when police fail to reasonably accommodate a disability during an investigation or arrest." *Thomas v. Town of Lloyd*, 2022 WL 1747650, at \*10 (citing *Durr*, 558 F. Supp. 3d at 28).

The problem for plaintiff is that he offers no meaningful support for his ADA and Rehab Act claims on either basis.  He states only the following:

> Concerning Plaintiff's ADA and Rehab Act claims, this Court has previously discussed the applicable law based on the allegations in the pleadings. *See*, *Thomas*, 711 F. Supp. 3d 122, 138 *et seq.* (N.D.N.Y. 2024)[.]

> Plaintiff has set forth evidence showing that the individual Defendants at the scene knew that this was a "wellness check" relating to an individual with mental health disabilities, and Trooper Diluvio acknowledged at her deposition that what she took to be

56

"aggression" from Plaintiff may have been a function of his mental health disabilities.  Pl. Addt'l Facts # 671.[15]  Accordingly, the motions of the NY State Police, the Town of Plattekill, and the Town of Lloyd for summary judgment as to Plaintiff's ADA and Rehab Act claims must be denied, and the Town of Plattekill Police Department and the Town of Lloyd Police Department should be reinstated as Defendants as to these claims.

Pl.'s Resp. to NYSP Defs. at 25–26.

Looking to the operative complaint for any additional background context is no more elucidating:  "Defendants knew or should have known that plaintiff was disabled; in particular, there were indications, known to the individual Defendants, that Plaintiff was undergoing a significant mental health incident.  Defendants subjected plaintiff to discrimination on the basis of his handicaps.  Defendants failed to reasonably accommodate plaintiff's disabilities."  Second Am. Compl. ¶¶ 135–37.

"The Court is not responsible for developing arguments on a party's behalf or addressing conclusory claims."  *Mar-Can Transportation Co., Inc. v. Loc. 854 Pension Fund*, 2024 WL 3887191, at *10 (S.D.N.Y. Aug. 21, 2024).  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  *Spectrum Ne., LLC v. City of Rochester*, 2022 WL

---

[15] Lest one be concerned that this citation substantiates plaintiff's broad claim of support in the record, it does not.  The referenced Paragraph 671 states only that "Trooper Diluvio acknowledged at her deposition that what she took to be "aggression" from Plaintiff may have been a function of his mental health disabilities."  *See* Pl.'s Add'l Facts ¶ 671 (citing Exhibit 15 to the Rothman Decl. (Trooper Diluvio deposition) at 155:25-156:8.")).

787964, at *4 (W.D.N.Y. Mar. 15, 2022) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).  Accordingly, plaintiff's ADA and Rehab Act claims will be dismissed.

### 2.    State-Law Claims

Plaintiff's remaining state-law claims are brought against the Town defendants for: (a) trespass; (b) false arrest and imprisonment; (c) assault and battery; and (d) vicarious liability.  *See* Second Am. Compl. at 26 n.2 (Count V: False Arrest and False Imprisonment); *id.* at 27 n.3 (Count Six: Assault & Battery), *id.* at 28 n.4 (Count Seven: Trespass).

### a.    Trespass

"The requisite elements for a claim of trespass are (1) the intentional entry by defendants on to plaintiffs' land and (2) the wrongful uses without justification or consent."  *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 141–42 (N.D.N.Y. 2024) (quoting *SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co.,* 578 F. Supp. 3d 511, 555 (S.D.N.Y. 2022)).

Plaintiff argues that "[f]or the same reasons stated in Point I (A) of Plaintiff's brief in response to the State Defendants' brief (at pages 15-18), which addressed Plaintiff's federal [unlawful entry] claims under the Fourth Amendment, Plaintiff should also be granted summary judgment on his cross-motion trespass claims under New York law against Officer Henry and Officer Gorham, and against the Town of Lloyd and the Town of Plattekill under the

58

doctrine of *respondeat superior*."  Pl.'s Resp. to Town Defs., Dkt. No. 105-37 at 12–13.

"[L]aw-enforcement officials have a privilege to enter private property to perform their legal duties." *Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 489 (E.D.N.Y. 2016).  As the Court has explained above, the relevant undisputed facts establish Officer Gorham and Officer Henry, who arrived on the scene later, were reasonably performing their legal duties—responding to assist Trooper Diluvio—when they entered plaintiff's home.  Accordingly, plaintiff's trespass claims must be dismissed.

### b.    False Arrest and Imprisonment

The elements of a false arrest claim under Section 1983 are "substantially the same as a claim for false arrest under New York law." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012), *as amended* (Dec. 4, 2012) (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996)).

"Under New York law, an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Ackerson*, 702 F.3d at 19 (quoting *Broughton v. State of New York,* 37 N.Y.2d 451, 456 (N.Y. 1975)); *see also Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 520–21 (S.D.N.Y.), *on reconsideration in part,* 133 F. Supp. 3d 563 (S.D.N.Y. 2015)

("Under New York law, the tort of false arrest is synonymous with that of false imprisonment.").

For the same reasons that the Court has denied defendants' motions for summary judgment on plaintiff's Fourth Amendment false arrest or imprisonment claims above, the Court denies the Town defendants' motion for summary judgment on plaintiff's state-law false arrest and imprisonment claims.

### c.    Assault and Battery

"The elements of New York assault and battery and Section 1983 excessive force claims are 'substantially identical.'" *Chinese Am. Citizens All. Greater New York v. New York City Dep't of Educ.*, 802 F. Supp. 3d 483, 542–43 (S.D.N.Y. 2025) (quoting *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021)). Accordingly, for the reasons set forth above with respect to the excessive force claims, the Town defendants' motion for summary judgment on plaintiff's state-law assault and battery claims is denied.

### d.    Vicarious Liability

"Under the common-law doctrine of respondeat superior, an employer— including the State—may be held vicariously liable for torts, including intentional torts, committed by employees acting within the scope of their employment[.]" *Rivera v. State*, 34 N.Y.3d 383, 389 (N.Y. 2019).

As plaintiff's state-law claims for false arrest and imprisonment and assault and battery against Officers Henry and Officer Gorham survive summary

60

judgment, the Town of Lloyd and the Town of Plattekill could still be liable for these claims under a *respondeat superior* theory.[16]  *See, e.g., Castro v. Cnty. of Nassau*, 739 F. Supp. 2d 153, 184 (E.D.N.Y. 2010) n.27 (collecting cases).  Accordingly, those state-law derivative-liability claims against the Town of Lloyd and the Town of Plattekill survive summary judgment.

## V.    <u>CONCLUSION</u>

Plaintiff's § 1983 individual-capacity Fourth Amendment claims for unlawful entry against Trooper Diluvio and Sergeant Nielson warrant a trial.  So too do plaintiff's § 1983 individual-capacity Fourth Amendment claims for excessive force and false arrest and imprisonment against Trooper Diluvio, Sergeant Nielson, Officer Gorham, and Officer Henry.

Likewise, plaintiff's state-law claims for false arrest and imprisonment and assault and battery survive against Officer Gorham and Officer Henry. And because their respective employers could be liable under a state-law theory of *respondeat superior*, the Town of Plattekill and the Town of Lloyd must remain in this suit.

---

[16]  On January 11, 2024, in disposing of the Town defendants' renewed motion to dismiss plaintiff's second amended complaint, the Court dismissed the police departments from this case.  *See* Dkt. No. 62 at 10.  The Court also dismissed plaintiff's § 1983 *Monell* claims against the Town of Plattekill and the Town of Lloyd.  *See id.* at 36.  However, the Court denied the Town defendants' bid to dismiss the state-law claims for *respondeat superior* against the Town of Plattekill and/or the Town of Lloyd.  *See id.*

However, plaintiff's remaining claims (whether arising under federal or state law) against any other defendants (whether they have been identified and served or not) must be dismissed.

Therefore, it is

ORDERED that

1.  The State defendants' motion for summary judgment (Dkt. No. 101) is GRANTED IN PART and DENIED IN PART;

2.  The Town defendants' motion for summary judgment (Dkt. No. 100) is GRANTED IN PART and DENIED IN PART;

3.  Plaintiff Thomas's cross-motion for summary judgment (Dkt. No. 105) is DENIED;

4.  The letter motions seeking judicial notice (Dkt. Nos. 108, 109) are DENIED as moot;

5.  Plaintiff Thomas's Fourth Amendment unlawful entry claims (Count I) against the Town Defendants and Plaintiff Thomas's state-law trespass claims (Count VII) are DISMISSED;

6.  Plaintiff Thomas's ADA and Rehabilitation Act claims (Count III) are DISMISSED;

7.  Plaintiff Thomas's Fourth Amendment unlawful entry claims (Count I) against the individual State defendants (i.e., Trooper Diluvio and Sergeant Nielson) will proceed to trial;

8. Plaintiff Thomas's Fourth Amendment excessive force claims (Count I) will proceed to trial against the individual State and Town defendants (i.e., Trooper Diluvio, Sergeant Nielson, Officer Henry, and Officer Gorham);

9. Plaintiff Thomas's state-law assault and battery claims (Count VI) will proceed to trial against the Town defendants (i.e., Officer Henry, Officer Gorham, the Town of Lloyd, and the Town of Plattekill);

10. Plaintiff Thomas's Fourth Amendment false arrest or imprisonment claims (Count I) will proceed to trial against the individual State and Town defendants (i.e., Trooper Diluvio, Sergeant Nielson, Officer Henry, and Officer Gorham);

11. Plaintiff Thomas's state-law false arrest or imprisonment claims (Count V) will proceed to trial against the Town defendants (i.e., Officer Henry, Officer Gorham, the Town of Lloyd, and the Town of Plattekill);

12. The Town of Lloyd Police Department, the Town of Plattekill Police Department, the New York State Police, and the Poes are TERMINATED from the docket as defendants in this action; and

13. The parties shall file a joint status report in THIRTY DAYS from the date of this opinion advising the Court of trial readiness and whether a settlement conference before the magistrate judge might be fruitful.

The Clerk of the Court is directed to terminate the pending motions, terminate the above-referenced defendants, and set a deadline accordingly.

63

IT IS SO ORDERED.

Dated:  July 22, 2026
        Utica, New York.

David N. Hurd
U.S. District Judge